## AFFIDAVIT OF JOYCE FREELAND

**STATE OF MISSISSIPPI**
**COUNTY OF LAFAYETTE**

Personally appeared before me the undersigned authority in the aforesaid county and state JOYCE FREELAND, to me personally known, who on her oath does swear:

1. I was co-counsel with my husband Tom Freeland as the defense attorneys for Dr. Cassandra Thomas in a Medicare and Medicaid fraud case, Cause No. 2:09cr043 in the Southern District of Mississippi. This case resulted in a four-week trial in Hattiesburg in June 2010, with Dr. Thomas being acquitted of all charges (hereinafter, the "Hattiesburg Case").

2. I was also co-counsel with my husband Tom Freeland as the defense attorneys for Dr. Cassandra Thomas in a separate Medicare and Medicaid fraud case, Cause Number 3:08cr170DPJ-JCS also in the Southern District of Mississippi (hereinafter, the "Jackson Case").

### Inaccurate Information on the Internet

3. Both the Motion to Substitute Attorney (Docket Entry No. 80) and the Motion for New Trial (Docket Entry No. 86) filed by Robert L. Gibbs and Karen Livingston-Wells in this case are based on scurrilous and untrue descriptions of an "arrest" of my husband in the week prior to the trial in the Jackson Case. These descriptions were posted anonymously on one or more blogs available on the Internet, amount to a vicious cyberbullying campaign, but were not posted, to my personal knowledge, until <u>after</u> the Jackson trial was concluded.

4. The conclusory statements in the Motion for New Trial and Dr. Thomas's affidavit to the effect that "personal issues in the days leading up to the trial caused the Freelands to

be unable and unwilling to focus on a vigorous defense of Dr. Thomas" are simply untrue and are based on false, incomplete, and overblown descriptions of a minor incident posted <u>after</u> the trial.

5.  As explained in my Declaration in response to the Motion to Substitute Counsel, the misdemeanor charge did not occupy my time more than briefly prior to trial in the Jackson Case (a) in part, because I knew that several of the statements made by           to the Oxford police were misleading and false; and (b) because I had proof to that effect.

6.            is someone I would have considered a family friend.  She is the wife of an attorney who grew up in Oxford, Mississippi, and had a practice based in New Orleans defending litigation filed in Louisiana and South Mississippi for an oil & gas client based in Texas.  When the           evacuated from Katrina, we had an office sharing arrangement with the husband for several years and helped him save a lucrative practice.

7.  I had not seen           for some time when she sought Tom and me out on the Oxford Square Tuesday night, March 22, 2011.  She joined us at City Grocery and told us elaborate stories about how her stepson

          was "hearing voices that were telling him what to do"[1] and "is trying to destroy my marriage."

8.  By making two phone calls a few days later, I helped           get an appointment with a local, well-respected psychiatrist concerning her sense that she was in danger from her stepson.

9.            motivation throughout our conversations that week was to persuade her husband to return to the marital home.  He had been traveling on business and on hunting trips and was about to return to Oxford, staying at what           continues to call the

---

[1] Please note that, after the inaccurate and outlandish stories that I later heard Ms. White tell about events when I was there, I no longer believe the stories she told about her stepson "hearing voices."

"Alumni House," to her embarrassment – because it would make it public in the community that he had decided to leave her.

10.  Late Thursday, March 24, 2011, she sent me a text with the following information about her meeting with the psychiatrist:

> Hi; got out of there by 2:50 pm; He said that I am fine and do not need to come back unless I want to for support and he will do that for me.    is in denial about how bad    is and about his severe abuse of alcohol        .  The drugs    is on are anti-psychotic drugs and a heavy dose @that. He used the word "avoidance" in reference to    Without knowing    but believing the stories I conveyed,    is psychotic, or schizophrenic, or evil (for planning his deeds towards me);    never believes what I tell him.  It all helps verify it to hear everyone saying the same thing.  He told me not to be in the house alone with    anymore.  I bet    won't get help. :(

11.  Since I no longer believe that the stories    was telling me about her family members were true, and since these texts could be quite damaging to    I would ask that counsel request that this Affidavit, if filed in the Jackson Case, be filed under seal.

12.  Copies of the complete set of text messages between    and myself are attached as Exhibit A.

13.  On Friday, March 25, 2011, I invited    to join us for drinks at the City Grocery.  I sat and listened to her for approximately three and ½ hours – from 6:00 pm until 9:30 pm.  My husband was visiting with friends at another table, including a couple who had just announced they were moving to Virginia.  He visited intermittently at the table where    and I were sitting, with me always, by happenstance, sitting between them.

14.     initially seemed fine, and we were celebrating that unexpectedly her husband had agreed to go to counseling.  At about 9:15 p.m., however, she suddenly became a bit emotional and "touchy-feely," reaching out across the small table, taking both Tom's and my hands, and begging us "to be her divorce attorneys."  We both told her <u>emphatically</u> that we would

3

not do that, but that she did need to get a divorce attorney, since her husband had told her he had retained one.

15.   Around 9:30 p.m., while Tom was away from the table again,       mood suddenly changed. She became morose and started saying over and over again "Thirteen years, gone. . . thirteen years gone." At that moment Tom rejoined us and said "So,     what do you expect to accomplish by seeing a counselor on Monday?" and she looked at him like she was about to cry.

16.   I called him aside, and the incident referred to as a "confrontation" occurred. I told Tom how her mood had changed, told him to <u>please</u> not ask her that question again right now or he would undo everything I had accomplished in getting this family to counseling, and told him I thought she needed help in getting home.

17.   I left without saying goodbye to      and Tom called me several times, first, trying to locate      after she drove off unexpectedly looking for her husband at local hotels and, then, to report that there was a car he didn't recognize at the      home when he checked there (as we agreed on one of the calls) and that the house was fully lit and seemed to be occupied.

18.   I was fully aware that the incident later described on the Internet as "stalking" was actually a much more benevolent effort of us both to make sure      got home safely.

19.   I had been checking on      by text at least once a day and in response to a text from me the next morning (after the "alleged" incident), she sent me the following texts:

> . . .      is coming by for coffee and to get his mail. Will catch up with you later!
>
> Hi!      came by and got his mail, and his fishing license, and said he just needs some time to be apart, but he still loves me and he hugged me several times; he said he would still go to counseling with

4

me. He does not want a divorce. Oh well! I need to call one of my children that just left a message. FYI

. . .

[Sunday, March 26, 2011, 10:52 a.m.] Thank you; you give great advice! I am still very sad about the whole thing. The hail and thunder woke me up before 5 a.m., then the power went out. Have a very, nice day, and thanks for your help; I owe you some food and wine! Talk to you soon . . . . . Love,

20. All of her text messages to me are totally inconsistent with the version of Friday night that she provided to the Oxford police the following Tuesday.

21. I assumed that when her husband decided to move his gun collection out of the house in response to her story about her stepson being dangerous, she came up with another story to try to convince her husband to move back in "to protect her."

22. In hindsight, I may have been wrong, but after thinking hard about the odd story she told police, I knew it was, at a minimum, an extreme exaggeration and thought that it would blow over.

23. This incident did not affect my attention at, or preparations for, the trial (preparations which we had already started several times for the Jackson Case, which had been rescheduled a number of times, and preparations which we had also done for the Hattiesburg Case).

24. Since the conclusion of the trial, the falsehoods and vicious personal and professional attacks circulating on the Internet have, however, been very consuming.

### Other Charges in Ineffectiveness Motion

25. I confirm that all of the matters discussed in my husband's affidavit being provided today to counsel concerning trial preparation, jury selection, the conduct of the trial, and otherwise are truly and accurately described.

26. In addition, my demeanor during the trial was businesslike and focused. There was no bickering between my husband and myself. Anything to the contrary has been

imagined by someone after hearing the wild stories circulating on the Internet. Dr. Thomas's friends and family, including witnesses, and, in particular, the gallery were difficult to deal with during the Jackson Trial. They were all intensely supportive of her, with reason, but did not understand the legal and factual issues. We simply did not have time to "hand hold," particularly the few people we were holding as potential witnesses and who were anxious to know what was going on in the courtroom.

27. We did, however, adequately prepare all appropriate witnesses.

28. Dr. Thomas was aware that we were having trouble reaching certain witnesses, such as a nurse practitioner Dr. Thomas assured us would testify – this nurse practitioner avoided our investigator, she ignored calls to her home, her cell, and her work.

29. While Clara Reed, a relative who has successfully owned and operated home health agencies and/or assisted living facilities, repeatedly offered to testify, we decided in both the Hattiesburg Case and the Jackson Case, that putting her on the stand could actually lead the jury to believe that "physical medicine" services were available from home health agencies in the areas in question. Mrs. Reed's appearance and demeanor as an obviously successful businesswoman (who had faced the possibility of charges on billing matters herself in the past) entered into our strategic decision that it would be best not to call her as a witness.

30. In particular, the affidavit filed by Kae Patterson is troublesome. Kae Patterson, in an early telephone interview, volunteered how much she thought Dr. Thomas's troubles were based on her placing her trust in her husband. She tends to be talkative in a pleasant way and to stray from the question put to her. Regardless, she first tried to schedule being in Canada during the trial in the Jackson matter, then, at the last moment, in the witness room decided she really did not want to testify. There was no need to have the financial information that she

provided for us audited – it was accurate as far as giving the general picture of the costs of operating the business and the profits, and that picture was not helpful in presenting a defense.

      31.    The statement that Dr. Thomas had "[a]solutely 'no say' in selection of jurors who were deciding her fate" is absolutely untrue. In both the Hattiesburg Case and the Jackson Case, I turned to her and compared notes periodically throughout voir dire and jury selection. She did, however, in the Jackson case, express wishes that simply could not be met, based on the array we faced – i.e., to have a middle-class or professional black man on the jury.

### Conclusion

      32.    There was no strain on my relationship with my husband at the time of the trial in the Jackson Case that affected our vigorous defense of Dr. Thomas. I still believe that there is a reasonable interpretation of the applicable regulations and provisions of the Carrier Manual that, under the Rule of Lenity, should have resulted in Dr. Thomas's acquittal. We briefed and argued and raised that issue throughout the trial and Dr. Thomas is aware that we were prepared to argue it vigorously on appeal.

*Joyce Freeland*
Joyce Freeland
Miss. Bar No. 102183

Sworn and subscribed before me on this the 4th day of November, 2011.

*Sherry Wall*
Notary Public
By: *Betty Chapman, DC*

MY COMMISSION EXPIRES JAN. 1, 2012

7

## Messages with ▮▮▮ Cell


Received on Mar 23, 2011 12:21:29 PM
Meeting Dr. tomorrow @1:30pm. Thank you so much!!!


Sent on Mar 23, 2011 1:52:37 PM
Great!


Received on Mar 23, 2011 1:56:09 PM
Thank you;I have missed seeing ya'll!


Sent on Mar 23, 2011 1:57:50 PM
Let me know how u are after ▮▮▮ leaves!

Received on Mar 23, 2011 1:59:39 PM
Ok;he is driving back and said he will get his mail. Will let you know. Thanks!

Received on Mar 23, 2011 5:59:56 PM
Will do after dinner!


Sent on Mar 23, 2011 6:00:10 PM
Ok

Received on Mar 23, 2011 9:07:50 PM
The ▮▮▮ took me to Palmer's;that was fun. ▮▮▮ came by and commented on how nice the yard looked and the house. He got his mail, asked if I was going to see a couselor; I said yes, tomorrow. He gave ▮▮▮ a pill and asked me to mark the calendar. He looks sad and did not hug me this time. ▮▮▮ has given him the name of a female attorney;he said he called her, but has not filed papers. Thanks for dinner last night and for checking on me. I cannot wait to talk to the doctor tomorrow! Will followup. Keep calm and carry on! Love, ▮▮▮


Sent on Mar 23, 2011 9:11:01 PM
Hang in there. I like Palmer's. I am on the way home from the office & will send u another text when I get there. Joyce


Received on Mar 23, 2011 9:12:08 PM
You worked too late!


Sent on Mar 23, 2011 9:12:48 PM
I know but I had 2 drinks in between!

Received on Mar 23, 2011 9:13:39 PM
Good for you! We only live once!


Sent on Mar 23, 2011 10:10:29 PM
I'm home. So glad you got to go out with the ▮▮▮ I wonder iif ▮▮▮ has figured out he can't get a divorce in Mississippi unless he has grounds (which he doesn't have) or you consent. In Mississippi if you had the mental problems instead of ▮▮▮ couldn't get a divorce until you are mentally ok. Sounds like he is confused! Slleep tight & let me know how it goes with ▮▮▮ tomorrow! Joyce

Received on Mar 23, 2011 10:12:14 PM
Thank you, Joyce! Love, ▮▮▮

Received on Mar 23, 2011 10:19:14 PM
You are so smart!


Sent on Mar 23, 2011 10:20:40 PM
Thanks! We are watching your back! Sleep tight. Love Joyce


Received on Mar 23, 2011 10:21:39 PM
I just chuckled! Thank you!

EXHIBIT A

**Messages with          Cell**



Sent on Mar 24, 2011 4:51:49 PM
How did it go with          Joyce



Sent on Mar 24, 2011 5:03:03 PM
Do you want to meet us at Thacker Mountain Radio at Off Square Books at 5:30 or afterwards at City Grocery Bar around 7:10?



Received on Mar 24, 2011 5:05:05 PM
Hi;got out of there by 2:50pm;He said that I am fine and do not need to come back unless I want to for support and he will do that for me.          is in denial about how bad          is and about his severe abuse of alcohol          The drugs          is on are anti-psychotic drugs and a heavy dose @that. He used the word "avoidance" in reference to          Without knowing          but believing the stories I conveyed,          is psychotic, or schizophrenic, or evil(for planning his deeds towards me)          never believes what I tell him. It all helps verify it to hear everyone saying the same thing. He told me not to be in the house alone with          anymore. I bet          won't get help. :(

Received on Mar 24, 2011 5:08:05 PM
I wish I could but I have dinner plans with someone else tonight @6:30pm. Maybe this weekend sometime? Thanks for all of your help. I am so tired---slept 3 hrs..



Sent on Mar 24, 2011 5:09:17 PM
Have fun getting out.  Will touch base tomorrow.



Sent on Mar 25, 2011 5:38:50 PM
How are you doing?  I was going to invite you to meet Tom & me for a drink but he is out of pocket?  Would you be interested?  Joyce

Received on Mar 25, 2011 5:53:55 PM
Ok          just came by and had a glass of wine and I started crying when he left. Where are you?



Sent on Mar 25, 2011 5:54:43 PM
On our way to City Grocery bar.

Received on Mar 25, 2011 5:55:51 PM
Ok;I am pretty casual, but will meet you there! Thanks!



Sent on Mar 25, 2011 5:56:10 PM
Casual works!

Received on Mar 25, 2011 5:56:55 PM
Thank you!



Sent on Mar 26, 2011 8:35:10 AM
I'm sorry about the end of last night!  Hope your morning is more positive!

Received on Mar 26, 2011 8:38:00 AM
Thank you;          is coming by for coffee and to get his mail. Will catch up with you later!

Received on Mar 26, 2011 10:26:49 AM
Hi;          came by, got his mail, and his fishing license, and said he just needs some time to be apart, but he still loves me and he hugged me several times;he said he would still go to counseling with me. He does not want a divorce. Oh well! I need to call one of my children that just left a message.  FYI



Sent on Mar 26, 2011 10:31:22 AM
I think getting him to counseling is a good thing to do.  Whether it saves your marriage or not it may help save someone from being hurt by          & could help          start dealing with all of this.  It could give you a chance to save the marriage too.  It is the loving and right thing to do.  I think you are right tho to not want the situation with          being out of the house to go on indefinitely.  The timing is up to you!  Joyce

## Messages with Susan Cell

Received on Mar 26, 2011 10:52:09 AM
Thank you;you give great advice! I am still very sad about the whole thing. The hail and thunder woke me up before 5 a.m., then the power went out. Have a very nice day, and thanks for your help;I owe you some food and wine! Talk to you soon.....Love,


Sent on Mar 27, 2011 10:27:03 AM
How are you doing this morning? How's


Sent on Mar 28, 2011 7:26:49 AM
Hope you get ▓▓▓▓ to go to see someone about the situation today. Let me know how things go today!